Filed 1/15/16  P. v. Thomas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068052 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1101664) |
| SHAUN PATRICK THOMAS et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Affirmed and remanded with directions.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Shaun Patrick Thomas.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant Michael James DeGraw.

Richard de la Sota, under appointment by the Court of Appeal, for Defendant and Appellant Jenna Ann DeGraw.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

In an amended information, defendants and appellants Shaun Patrick Thomas (Thomas), Michael James DeGraw (Michael) and Jenna Ann DeGraw (Jenna) (sometimes collectively, defendants) were charged with attempted murder (Pen. Code,[1] §§ 187, subd. (a) & 664; count 1); kidnapping (§ 207, subd. (a); count 2); assault with a firearm (§ 245, subd. (a)(2); count 3); and street terrorism (§ 186.22, subd. (a); count 6). Thomas and Michael were also charged with being felons in possession of a firearm (§ 12021, subd. (a)(1); counts 4 & 5).

As to counts 1, 2 and 3, the amended information alleged that Thomas and Michael personally used a firearm (§ 12022.5, subds. (a) & (d)), and as to counts 1 and 2, that both of these defendants personally and intentionally used and discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c) & (d)). As to counts 1 and 2, the amended information further alleged that a principal in the offense personally discharged a firearm causing great bodily injury to the victim within the meaning of section 12022.53, subdivisions (d) and (e)(1); that a principal discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1); and that a principal in those offenses personally used a firearm within the meaning of section 12022.53, subdivision (b).

---

[1] All further statutory references are to the Penal Code.

2

As to counts 1 through 5, the amended information alleged defendants committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1) & (5)).  Finally, the amended information alleged that Thomas previously had suffered one serious felony conviction and two prison priors and that Michael had suffered two serious felony convictions and five prison priors (§§ 667, subd. (a)(1) & 667.5, subd. (b)).

After the first jury deadlocked, the second jury deadlocked on the kidnapping charge, found Jenna not guilty of assault with a firearm and found the firearm use enhancements alleged against her not true, but convicted defendants of all other counts and found all of the other allegations true.

In a bifurcated proceeding, the court found true the prior conviction allegations against Thomas and Michael.  The court sentenced Thomas to 69 years four months; Michael to 132 years to life; and Jenna to 17 years.

On appeal, defendants collectively and separately raise a series of claims.[2]  Defendants contend the court abused its discretion when it dismissed a juror during

_____

[2]     Defendants Michael and Jenna joined in all arguments raised by each other and by Thomas, to the extent those arguments accrued to their benefit and were not inconsistent with any of their own arguments.  (See Cal. Rules of Court, rule 8.200(a)(5) [providing: "Instead of filing a brief, or as part of its brief, a party may join in or adopt by reference all or part of a brief in the same or a related appeal"].)  We note that our high court recently criticized blanket joinders in claims raised in a multiple defendant appeal.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant*) [stating "[w]e strongly disapprove of this seriously improper tactic"].)  The *Bryant* court concluded that, although joinder is broadly permitted, California Rules of Court, rule 8.200(a)(5) is not satisfied by "cursory and unfocused statements" of joinder.  (*Id.* at p. 363.)  Here, we note Michael at least identified the specific claims of Thomas he joined, whereas Jenna's joinder is not particularized with respect to any claims of Thomas and/or Michael.  In any

deliberations after the juror told the court he was biased and was unable to perform his duties impartially. Thomas separately contends the admission of the victim's pretrial identification of Thomas violated his due process rights because the photographic identification allegedly was impermissibly suggestive. Thomas alternatively contends if his due process claim was forfeited, he received ineffective assistance as a result of counsel's failure to object to the pretrial identification.

Thomas also contends that the court erred by allowing the People's gang expert to opine whether defendants committed the instant crimes for the benefit of a criminal street gang; that his trial was rendered fundamentally unfair by cumulative error; that the evidence was insufficient to prove the substantive gang participation offense (i.e., count 6); and that the court should have struck his one-year prison prior enhancement because it allegedly was based on the same prior conviction that the court used to impose the five-year prior serious felony enhancement.

Thomas and Michael also contend that their convictions for the substantive gang offense under section 186.22, subdivision (a) should have been stayed under section 654, subdivision (a) and that the court erred in failing to grant them presentence conduct credits under section 2933.1. Finally, Michael separately contends there was insufficient

_____

event, we accept the joinders only to the extent one defendant's argument accrues to the benefit of the other, and we reject the purported joinders where evidentiary insufficiency is asserted and the defendant purporting to join has not articulated how the evidence was insufficient as to him or her. (See *id.* at pp. 363–364; see also *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

4

evidence to prove one of his two prior strike allegations and the matter should be remanded for retrial on this issue.

As we explain, we conclude the sentence for both Thomas and Michael on the substantive gang offense should have been stayed under section 654, subdivision (a). We further conclude the court erred in failing to grant Thomas and Michael presentence conduct credits under section 2933.1. Finally, we conclude the evidence was insufficient to prove one of Michael's two prior strike allegations. As a result, we remand Thomas's case for the limited purpose of determining his presentence conduct credits and remand Michael's case for the limited purpose of determining both his presentence conduct credits and whether his prior conviction under former section 245, subdivision (a)(1) was a prior violent or serious felony. In all other respects, the judgments of conviction are affirmed.

### OVERVIEW

Victim Randy Pena testified that he joined a Victorville-based criminal street gang called East Side Victoria (ESV) when he was 12 years old and that, at the time of the incident, Pena was about 22 years old. Pena went by the moniker "Psychoman." Pena testified that Michael was also a member of ESV and went by the moniker "Capone"; that when Pena was shot, Michael was in command of ESV because Michael's brother, George DeGraw (George), was incarcerated; and that George went by the moniker "Rascal."

5

Ashley was Pena's girlfriend. In March 2011, one or more members of ESV determined Ashley was a "snitch" because someone in the gang allegedly acquired documentation showing she had provided information to law enforcement about ESV and/or its members. George, Michael and Jenna both wanted Pena to "hurt" and take "care of" Ashley, but Pena refused because he did not believe Ashley was a snitch, particularly after Pena asked for but was given no proof that Ashley had in fact spoken to law enforcement about ESV.

On March 12, 2011, a meeting to "discuss Ashley" was to take place between Pena and Michael at Pena's father's house. When that meeting did not take place in the afternoon, Pena testified they arranged to meet later that evening. Around 9:15 p.m., Pena and Ashley were at a friend's house in Victorville when Pena saw a white van pull up and stop in front of the house. Pena alone went outside.

Pena testified Jenna was in the driver's seat of the van. A man, later identified by Pena as Thomas, and Michael were standing outside the van, on the street. Pena noticed that Thomas and Michael were wearing purple latex gloves. As a 10-year gang member, Pena knew that gang members typically wore gloves to prevent gun powder residue from getting on their hands and to eliminate fingerprints on a weapon. Pena got inside the van. He testified he did so because he did not want anything to happen to anybody else, including Ashley. Pena testified he was scared when he got inside the van, believing his life was "on the line."

6

Jenna drove and Michael sat in the front passenger seat. Thomas, who went by the moniker "Troubles," sat behind Jenna, right next to Pena. Pena observed a bulge under Thomas's jacket and believed Thomas was carrying a gun. Pena noticed Thomas kept his right hand near the bulge. Jenna drove the van through several streets to a "big dirt field" near a hospital. Jenna stopped the van in the middle of the field.

Pena testified he and Thomas had "some words" inside the van, and Pena saw Thomas "go[] for the weapon." In response, Pena turned his body, put his left hand on Thomas's right hand and attempted to prevent Thomas from pulling out the weapon. Pena also began hitting Thomas. Michael in response twice "pistol whipped" the back of Pena's head with the butt of a gun. Pena continued to put up a fight because he believed his "life was on the line." Pena testified he did not have a gun to defend himself from his attackers.

Pena next saw Thomas pull out a gun from his right side, point the gun at him and shoot. Michael also took a shot at Pena. Pena jumped over a row of seats into the back of the van to escape. Pena testified he was shot in the back as he was moving to the back of the van. A bullet also grazed Pena's head. Pena estimated five shots were fired by Thomas and Michael inside the van. Pena testified he ended up wedged between the last row of seats in the van and the back rear door, which was locked. About 20 minutes after he got into the van, Michael opened the back rear door of the van and Pena stumbled out. Defendants left Pena in the dirt field and immediately took off in the van.

Pena testified he tried to run from the field to the nearby hospital. As he moved, however, he felt blood "sloshing inside" and he fell to his knees in the street in front of an oncoming car. The car stopped, and its occupants drove Pena to the hospital. Pena was later airlifted to another hospital and treated for his wounds.

San Bernardino County Sheriff Deputy Luke Gaytan testified as the People's gang expert. In mid-June 2011, Deputy Gaytan contacted Pena regarding the March 2011 shooting after Pena repeatedly had refused to talk to law enforcement. Concerned about being labeled a "snitch" or a "rat," Deputy Gaytan agreed to pick up Pena around the corner from Pena's father's house because Pena did not want to be seen getting into an unknown vehicle, including the unmarked police car driven by Deputy Gaytan. At the police station, as discussed in more detail *post*, Pena was given an admonishment and then shown a six-pack photographic lineup. Pena immediately identified Thomas as one of his attackers.

Deputy Gaytan opined that at the time of Pena's shooting, Thomas, Michael and Jenna were all members of ESV and that Michael was the "person in charge" of the gang because his brother George was incarcerated. As discussed in more detail *post*, Deputy Gaytan further opined that the shooting of Pena was committed for the benefit of, at the direction of, or in association with ESV.

About a year after the shooting, investigators found a white van that was previously registered to Jenna's then husband, Manuel Barragan. Barragan in late April 2011 had filed with the Department of Motor Vehicles a release of liability in connection

8

with the white van.  The release provided Barragan had transferred the van on March 27, 2011—the same month as the shooting.  Investigators recovered the white van in the Los Angeles area and towed it to the sheriff's crime lab in San Bernardino, where it was processed for evidence.  Among other evidence, investigators found a hole in the plastic trim toward the rear of the van's sliding door.  When the plastic trim was removed, investigators found a defect consistent with a bullet strike.

## DISCUSSION

### A.  Juror Removal

As noted, all three defendants on appeal contend the court erred when it excused a juror two days after deliberations began because of a disabling bias that rendered the juror unable to perform his duty.

#### 1. *Additional Background*

Thomas's father-in-law, Ronald Glidden, testified Thomas and Glidden's daughter Heidi, who subsequently married Thomas, arrived at Glidden's home in Pomona, California between 3:00 and 3:30 p.m. on March 12, 2011 (i.e., the day of the shooting).  Glidden and his wife were celebrating their wedding anniversary that day.  Glidden testified that Thomas and Heidi did not leave the house until about 10:30 or 11:00 p.m. that same night and that other than go to the bathroom, Thomas was with Glidden and his family the entire time.

As relevant to the issue on appeal, Glidden testified that he was an ordained deacon, a licensed minister and the Sunday school director at his local church.  When

9

asked if Glidden would lie for his son-in-law Thomas, whom Glidden said he loved, Glidden responded, "If I lie, I also lie to God, and I cannot do that." Glidden also testified he took his oath to God "[v]ery seriously."

The record shows during closing, defense counsel for Thomas argued to the jury that Glidden was a "licensed minister. He's an ordained deacon. It sounds like he spends a lot of time -- he does even janitorial work for them [i.e., the church] sometimes. [¶] I would submit to you, ladies and gentlemen, that when Mr. Ronald Glidden takes an oath to God to tell the truth, that it probably means something more to him than it does to Randy Pena."

About two days into deliberations, the court received a note from the jury foreperson stating one of the jurors, alternate No. 2, was biased as a result of his "religious beliefs" and wished to be excused from the jury. The record shows the prosecutor and two defense counsel stated the court and counsel should talk to the juror, whereas the third defense counsel suggested the court send a note back telling the jury to "keep working." The court decided to speak with this juror.

With counsel present, the record shows the following colloquy took place between the court and the juror:

"[The Court]: Okay. So let me just -- let me just say this. Please don't tell me anything about deliberations back there; okay?

"[Juror]: Okay.

10

"[The Court]: Don't tell me what anybody else thinks. Don't tell me what you think about the case, other than you -- you believe that you have a bias based upon religious beliefs that make it so that you can't be fair.

"[Juror]: Yes , sir.

"[The Court]: Okay. And I said, 'can't be fair.' Does that mean that you feel you can't make a decision because of that?

"[Juror]: I can make a decision, but -- but the decision, I have to admit, is because of a bias.

"[The Court]: Because of a religious-based belief?

"[Juror]: Correct.

"[The Court]: And not what you've heard here in court, is that correct?

"[Juror]: No. Well --

"[The Court]: Listen -- listen to me carefully. I'm sorry. I don't -- I don't want to put words in your mouth. And when you said, 'No' -- because I asked, 'is that correct?' And you said, 'No.' Which means, that what I said was incorrect. So let me say it again. Is the bias that you believe you have, one that you brought into court with you? I mean, did you just get religious over the course of the trial?

"[Juror]: Over the weekend? No, sir.

"[The Court:] Okay. So -- so I'm not trying to be facetious. I'm trying to understand. And I want to say something because -- see, everybody else has to know what I'm trying to get to. And I'm tiptoeing around it because I don't want you to tell me

11

about deliberations.  I don't want to enter into that.  I don't want to do something that's going to effect [*sic*] whatever this jury might say.  But if you're -- if you want to make a decision -- excuse me.  You heard me say at the very beginning of this case, that you must make a decision based upon the law that I give you and the evidence presented.  You -- you heard that; right?

"[Juror]:  That is correct.  Yes.

"[The Court]:  And so why didn't you tell us at that point, that due to religious concerns or faith concerns, that you might not be able to make a verdict?

"[Juror]:  Because it wasn't an issue at the time.  I'm also tiptoeing with -- without trying to go bring up what happened throughout the trial.

"[The Court]:  I understand.

"[Juror]:  And there was a specific --

"[The Court]:  Was it the argument of somebody that talked about a promise to God?

"[Juror]:  Yes.

"[The Court]:  Okay.

"[Juror]:  So without knowing that I had this bias coming in, I've struggled with this all weekend."

The record shows the court next asked counsel to approach the bench, ostensibly out of the hearing of the juror who was sitting in the jury box, and asked if they had any additional questions they wanted the court to ask.  The prosecutor suggested the court ask

12

the juror if he could put aside his religious beliefs. The court agreed that was a fair question, but noted given the responses of the juror already that the juror was going to answer that question in the negative. Thomas's defense counsel suggested the court "need[ed] to make inquiries of having an opinion and a bias." At that point, the court noted it was simply seeking input from all counsel and asked they step back.

Next, the court confirmed with the juror that he was seeking to be excused from the jury because of his *own* religious bias. The record shows the court then addressed the request of Thomas's defense counsel for additional inquiry, noting "if you wanted me to ask a question for the purpose of eliciting information rather than to potentially explore changing his mind, then I would understand that. You could approach and talk to me about that. But I think that what you suggested would just be my arguing to it. You have anything to say? I understand -- I'm not asking anybody to tell me what -- . . . I'm certainly going to give you a chance to say what you want me to do. And so I'm going to ask [this juror] . . . to step outside." However, before the juror left the courtroom, the record shows the court confirmed the juror was a member of a particular religious organization.

After the juror left the courtroom, the court asked counsel what should be done about the juror. The prosecutor argued the juror should be excused. Defense counsel for Thomas argued that the juror should not be excused and that the juror was entitled to consider the background of Glidden, Thomas's father-in-law. The court in response noted the juror did not state he had an opinion "based on Mr. Gliddon's background."

13

Instead, the court noted this juror said it was "his own bias that [was] religious. And that's -- that's -- I think it's certainly a distinction."

The court also noted it was not clear whether the juror's bias even favored the testimony of Glidden. The court stated, "I don't know that," to which Thomas's defense counsel stated, "[m]e either." The court noted that it had confirmed with the juror that he wanted to be excused because his own religious bias was influencing his decision in this case; that they were not going to get any further with this juror on this issue unless they had an "in-depth conversation" with him; and that if they had such a conversation, they would no longer be able to "use" this juror in the case.

The court thus ruled to excuse the juror rather than risk further inquiry with him. The court noted it wanted to avoid getting involved in the "deliberative process" and then putting the juror "back in the jury room to deliberate." The record shows all defense counsel joined in the objection to excuse this juror.

### 2. *Guiding Principles*

The law permits the trial court to discharge a juror at any time, including during deliberations, based on a showing of "good cause" that the juror is "unable to perform his or her duty." (§ 1089.) " ' "Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 898 (*Homick*).)

14

"While removal of a juror is committed to the discretion of the trial court, upon review, the juror's disqualification must appear on the record as a demonstrable reality. 'The demonstrable reality test entails a more comprehensive and less deferential review' than substantial evidence review. 'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias [or other good cause for removal] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' " (*Homick*, *supra*, 55 Cal.4th at p. 899; see *People v. Wilson* (2008) 44 Cal.4th 758, 821 [noting a person's inability to perform as a juror "requires a 'stronger evidentiary showing than mere substantial evidence' "].) In assessing the trial court's ruling, the reviewing court must "consider not just the evidence itself, but also the record of reasons the [trial] court provides." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053 (*Barnwell*).)

"A juror who expresses a fixed conclusion at the start of deliberations and rebuffs attempts to engage him or her in the discussion of other points of view raised by other jurors has refused to deliberate, and properly may be discharged." (*People v. Alexander* (2010) 49 Cal.4th 846, 926 (*Alexander*).) Moreover, a "deliberating juror's refusal to follow the law set forth in the instructions also constitutes a failure to perform the juror's duties, and is grounds for discharge." (*Ibid.*)

15

"The trial court's authority to discharge a juror includes the authority to conduct an appropriate investigation concerning whether there is good cause to do so, and the authority to take 'less drastic steps [than discharge] where appropriate to deter any misconduct or misunderstanding it has reason to suspect.' [Citation.] As we have stated, 'a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.' [Citation.] Nonetheless, the need to protect sanctity of the deliberations does not mean that any inquiry into the deliberation process violates the defendant's constitutional or statutory rights: 'secrecy *may* give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct.' [Citations.] On appeal, we review for abuse of discretion the trial court's decisions concerning whether and how to investigate the possibility that a juror should be discharged for failure to perform his or her duties, and whether, ultimately, to discharge the juror or to take some other action." (*Alexander*, *supra*, 49 Cal.4th at pp. 926-927.)

3. *Analysis*

In the present case, the record shows the court questioned the juror about the

16

juror's own religious bias after being informed of such bias by the jury foreperson. The record shows that before the court concluded its questioning of the juror, it brought trial counsel up to the bench and asked counsel if they had any additional questions they wanted the court to ask. In our view, the court acted reasonably and well within its broad discretion in connection with the *manner* in which it conducted its inquiry, as the court recognized the need for information in light of the juror's admission that he was biased and could not put that bias aside in deliberations, while at the same time avoiding any unnecessary intrusion in the jury's deliberations. (See *Alexander*, *supra*, 49 Cal.4th at p. 927; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 710-711 (*Fuiava*) [noting a court's decision to excuse a juror for good cause under section 1089, after conducting a "an adequate (but not overly) invasive inquiry," at times places the court "between a rock and a hard place" as the court's inquiry should not be too intrusive but "probing enough"].)

The record also shows on questioning the court properly excused this juror because its inquiry showed by a "demonstrable reality" that this juror could not perform his duty. Indeed, the record shows the juror repeatedly stated that he had a disabling bias; that he had struggled with this issue over the weekend; that the issue had come up only after the trial had started; and that as a result of such bias, he could *not* be fair and impartial. (See *Barnwell*, *supra*, 41 Cal.4th at p. 1053 [noting that "[a]pplying . . . different standards to the evaluation of different witnesses is, of course, contrary to the court's instructions and violative of the juror's oath of impartiality"].)

17

As such, we conclude that any further inquiry by the court on this issue was pointless (see *Fuiava*, *supra*, 53 Cal.4th at p. 714 [noting a court had discretion to decide that a " 'juror's disqualification is so clear that further [inquiry] is pointless' "] ); that "having received an admission of disabling bias from a juror," the court was not required "to attempt, in essence, to rehabilitate that juror by further exploring what the juror really meant" (see *ibid*); that the court specifically relied on the juror's repeated statements that he was biased as the basis for excusing this juror; and that accordingly, the court "relied ' "on evidence that, in light of the entire record, supports its conclusion that bias was established." ' [Citation.]"  (See *id.* at p. 713.)

Defendants contend the court should have defined "bias" for the juror.  We disagree.  As our high court noted in *Fuiava*, a court properly exercises its discretion when, such as in the instant case, a court decides "to take at face value [a juror's] statements that he understood the court's instructions and could not follow them because of a personal bias, and therefore not to attempt any additional clarification of the juror's state of mind -- or that of the rest of the jury."  (*Fuiava*, *supra*, 53 Cal.4th at pp. 714-715.)  This is particularly true when, such as in the instant case, the juror's statements of a disabling bias are repeated and "clear."  (*Id.* at p. 714.)

Finally, we conclude that any error in excusing this juror was harmless under any conceivable standard.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *Chapman v. California* (1967) 386 U.S. 18, 24.)  As noted by the court and by Thomas's defense counsel at the conclusion of the inquiry of this juror, it was not clear whether the

18

juror's disabling bias favored the People or one or more of defendants. Indeed, as the People note, it was entirely possible the juror did not believe the alibi testimony of Glidden and became biased against him and/or Thomas, after Thomas's counsel argued in closing that Glidden took an oath to God and that he therefore should be believed over Pena. In any event, it is presumed that once this juror was replaced and deliberations resumed, "the reconstituted jur[y] followed the trial court's instructions to begin the deliberations anew. [Citation.]" (See *Fuiava*, *supra*, 53 Cal.4th at p. 716.)

B. Evidence of Thomas's Photographic Lineup

Thomas contends his due process rights were violated when Pena identified him as one of Pena's attackers from a six-pack photographic lineup.

To determine whether the admission of identification evidence violates a defendant's right to due process, we consider " ' "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances." ' " (*People v. Thomas* (2012) 54 Cal.4th 908, 930 (*Thomas*); see *Perry v. New Hampshire* (2012) ___ U.S. ___, ___ [132 S.Ct. 716, 724–725].) We review the trial court's fact and credibility determinations, if any, deferentially and independently determine whether, under those facts, the identification procedure was unduly suggestive. (*Thomas*, at p. 930.)

Thomas contends his photograph in the six-pack is "shockingly different" from the photographs of the other five individuals. He contends that although the other five individuals in the six-pack were the same age and the same race, his photograph was

unduly suggestive primarily because he was the only one wearing a white shirt and he was the only one with numerous visible tattoos.

" '[T]here is no requirement that a defendant in a lineup be surrounded by people nearly identical in appearance.' " (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 790.) A six-pack photographic lineup is only suggestive if " 'anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 990.)

We have independently reviewed the six-pack photographic lineup shown to Pena. All of the men in the photos were of similar age and were of the same race, as Thomas notes; all have the same complexion and general facial expression; all have their eyes open and their mouths closed; and all have shaved heads.

What's more, each photograph depicts a male from the shoulders up; each is in color; and each was taken against a neutral background. (See *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1082 [noting that where "photographs in a lineup are of males of the same ethnicity and 'generally of the same age, complexion, and build, and generally resembling each other,' and where the accused's 'photograph did not stand out, and the identification procedure was sufficiently neutral,' the lineup is not impermissibly suggestive"]; contra, *People v. Carlos* (2006) 138 Cal.App.4th 907, 912 [noting a photograph in a six-pack was unduly suggestive because the suspect's name and identification number were directly under the suspect's picture, none of the other photographs included such information, much less under the individual's picture, and

20

none of the witnesses to the crime identified the defendant as the suspect at trial]; *People v. Nation* (1980) 26 Cal.3d 169, 174, 179–181 [noting defendant received ineffective assistance when defense counsel failed to object to identification testimony based on the "extraordinary suggestiveness" of the pretrial identification process, when three girls together went to a police station, after a man had pointed a gun at them and took one of the girls into some nearby bushes and had raped her, when one of the girls identified defendant in a mug shot as the attacker and then informed the other two of her finding, who then, after some discussion, all agreed defendant was the attacker despite the fact the victim had been considering another suspect's photograph, and when the police thereafter gave the girls *only* defendant's photograph to take home to show other possible witnesses].)

With respect to the shirts worn, we note one of the individuals in the six-pack is wearing a white shirt under a black shirt; two individuals are wearing what appear to be all black T-shirts; the other two individuals are wearing primarily black shirts, at least one of which has a colored collar; and Thomas is wearing what can be described as a white tank top. With respect to tattoos, Thomas is shown in the six-pack with a large tattoo around his neck and tattoos on his shoulders and chest. In addition to Thomas, one of the other individuals in the six-pack has tattoos on his neck and/or upper chest.

Although we disagree with Thomas that the differences in shirt color and number of tattoos rendered his photograph "shockingly different," much less made his photograph "stand out" from the others, we need not resolve that issue because we conclude Pena's

21

identification of Thomas was nonetheless reliable under the totality of the circumstances. In reaching this conclusion, we consider " 'such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]' [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1256 (*Virgil*); see *People v. Avila* (2009) 46 Cal.4th 680, 698 (*Avila*) [to successfully challenge lineup evidence a defendant must first establish that the lineup procedure was unduly suggestive *and* then establish the resulting identification was unreliable under the totality of the circumstances].)

Here, the record shows Pena sat next to Thomas for almost 20 *minutes* while Jenna drove the white van and Michael sat in the front passenger seat. Clearly, Pena had ample opportunity to view Thomas before Thomas went for his gun, they struggled and Thomas fired his gun. (See *Virgil*, *supra*, 51 Cal.4th at p. 1256.) Moreover, the record shows Pena was fixated on Thomas because after Pena got into the van, he saw a bulge in Thomas's jacket and noticed Thomas kept his hand near the bulge, by his waist. (See *ibid.*)

What's more, the record shows when the detective showed Pena the six-pack and suggested the suspect may or may not be in the lineup, Pena immediately identified Thomas as one of the two suspects in the shooting. The level of certainty demonstrated

22

by Pena further supports the finding the identification of Thomas was reliable. (See *Virgil*, *supra*, 51 Cal.4th at p. 1256.)

In addition, Pena was shown the six-pack photograph about two months after the shooting, after Pena repeatedly refused to cooperate with law enforcement about the incident. The time between the shooting and the identification also supports a finding Pena's identification of Thomas was reliable. (See *Avila*, *supra*, 46 Cal.4th at p. 698.)

Finally, the record shows Pena without hesitation identified Thomas in court as the individual standing with Michael outside the white van that was being driven by Jenna. (See *People v. Cooks* (1983) 141 Cal.App.3d 224, 306 [noting if a defendant sustains his or her burden of showing that the pretrial identification was impermissibly suggestive, "the in-court identification need not necessarily be excluded if the People can demonstrate that the in-court identification was otherwise reliable" based on the factors described *ante*], citing *Neil v. Biggers* (1972) 409 U.S. 188.) Based on the evidence summarized *ante*, we conclude that even *if* Pena's pretrial identification of Thomas was unreliable, Pena's subsequent in-court identification of Thomas was reliable.[3]

---

3      In light of our conclusion, we deem it unnecessary to determine whether Thomas forfeited his claim the court erred in admitting the six-pack identification evidence or whether Thomas received ineffective assistance when his counsel failed to object to such evidence.

C. Expert Opinion that Shooting Was Committed for the Benefit of, at the Direction of or in Association with a Criminal Street Gang

Thomas contends the court erred when it allowed Deputy Gaytan to testify over objection that the crimes committed in the instant case—as opposed to crimes based on hypothetical facts that tracked the facts in the instant case—were for the benefit of, at the direction of or in association with a criminal street gang for purposes of the sentencing enhancement in subdivision (b) of section 186.22.[4] In making this contention, we note Thomas does *not* challenge the jury's findings that ESV was a criminal street gang for purposes of section 186.22 or that he "inten[ded] to promote, further, or assist in any criminal conduct by gang members" within the meaning of subdivision (b)(1) of that statute.

Subdivision (b) of "section 186.22 requires proof of only two elements: (1) that the defendant committed a felony for the benefit of, at the direction of, *or* in association with any criminal street gang and (2) that he [or she] did so with the intent to promote, further, or assist in criminal conduct by gang members." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613.) Although "[n]ot every crime committed by gang members is related to a gang" (*People v. Albillar* (2010) 51 Cal.4th 47, 60), "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.)

---

4      As discussed *post*, subdivision (a) of section 186.22 creates a substantive offense unlike subdivision (b) of this statute.

Here, even *if* the court erred by allowing Deputy Gaytan to opine that the crimes in *this* case—as opposed to crimes based on hypothetical facts closely tracking this case (see *People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*))[5]—satisfied the element of "benefit of, at the direction of or in association with" a criminal street gang under section 186.22, subdivision (b)(1), we nonetheless conclude such error was harmless because the record contains ample *other* evidence supporting this same finding.

Indeed, Pena testified Michael was in charge of the ESV because George, Michael's brother, was incarcerated. Moreover, Pena himself admitted that at the time of the shooting he also was a high-ranking member of ESV and that he had been in the gang about 10 *years*; that George, Michael *and* Jenna wanted Pena to take "care of" Pena's girlfriend because they believed she was a snitch; that a meeting between Michael and

[5]      We note the issue in *Vang* was not the propriety of expert testimony regarding specific defendants, but rather the propriety of hypothetical questions which closely tracked the facts of a case. (*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4.) Indeed, *Vang* itself noted that "in some circumstances, expert testimony regarding the specific defendants might be proper. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507, cited with approval in *People v. Prince* (2007) 40 Cal.4th 1179, 1227.)" (*Ibid.*) "There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case. 'We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved. . . . Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in.' [Citations.]" (*People v. Wilson* (1944) 25 Cal.2d 341, 349.) Thus, while a witness may not express an opinion as to a defendant's guilt or innocence (*People v. Torres* (1995) 33 Cal.App.4th 37, 46–47), "[t]here are some crimes a jury could not determine had occurred without the assistance of expert opinion as to an *element* of the crime." (*Id.* at p. 47, fn. omitted.) Here, we note Deputy Gaytan did not express an opinion about Thomas's guilt or innocence but rather only opined on an *element* of section 186.22, subdivision (b)(1).

25

Pena was supposed to take place on the day of the shooting "to discuss" Pena's girlfriend; that when the meeting did not take place, a white van driven by Jenna drove up and parked outside a house where Pena and his girlfriend were visiting; and that when Pena went outside to meet with defendants, he saw Jenna in the driver's seat and Thomas and Michael standing outside the van, wearing purple latex gloves. Pena, as a long-time member of ESV, knew then that Thomas and Michael were likely wearing the gloves to avoid detection if and when they used firearms.

This evidence, which is entirely separate from Deputy Gaytan's expert testimony, is itself substantial and at a minimum supports a finding that Michael, Thomas and Jenna committed the offenses against Pena "at the direction of" ESV and/or its members for purposes of subdivision (b)(1) of section 186.22. As such, we conclude any error in admitting Deputy Gaytan's expert testimony on this particular element of section 186.22, subdivision (b)(1) was harmless as it was not reasonably probable a result more favorable to defendants would have resulted in the absence of the alleged error. (See *People v. Prieto* (2003) 30 Cal.4th 226, 247 [noting the standard announced in *Watson*, *supra*, 46 Cal.3d at page 836 applies to erroneous admission of expert testimony].)

D. Sufficiency of the Evidence and Substantive Gang Offense

Thomas next contends the evidence was insufficient to support his conviction on count 6, active participation in a criminal street gang. Subdivision (a)(1) of section 186.22 creates a substantive offense applicable to "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged

26

in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."  Thomas argues there is a lack of substantial evidence in the record to show he had "knowledge" that members of ESV engage in or have engaged in a pattern of criminal activity.  We disagree.

"[B]efore a defendant can be penalized for being an active participant in a criminal organization[,] . . . the defendant must be shown to have had knowledge of the gang's criminal purposes.  As the Supreme Court explained in *People v. Castenada* [(2000)] 23 Cal.4th 743 [(*Castenada*)], another case construing section 186.22, subdivision (a), '[u]nder *Scales* [*v. United States* (1961) 367 U.S. 203] [(*Scales*)], the due process requirement that criminal liability rest on personal guilt means simply that a person convicted for active membership in a criminal organization must entertain "guilty knowledge and intent" of the organization's criminal purposes.  [Citation.]  When our Legislature enacted section 186.22(a), which is at issue here, it was fully cognizant of the guilty knowledge and intent requirements the high court had articulated in *Scales*.  [Citation.]  This explains why the Legislature expressly required in section 186.22(a) that a defendant not only "actively participates" in a criminal street gang . . . , but also that the defendant does so with "knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity," and that the defendant "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." ' (*Castenada*, at p. 749.)  Although the Court concluded section 186.22, subdivision (a), exceeded the requirements of ' "the active membership test in *Scales*" ' (*Castenada*, at p.

27

750) because it also requires a finding a gang member aided and abetted a specific criminal offense committed by another gang member, the principle is clear: Criminal punishment based on active participation in a criminal gang requires knowledge of the gang's illegal purposes." (*People v. Carr* (2010) 190 Cal.App.4th 475, 487-488 (*Carr*).)

"As did the Supreme Court in *Castenada*, we construe the phrase 'the defendant knew that members of a gang engaged in or have engaged in a pattern of criminal gang activity' [citation] to correlate to the active membership test described in *Scales,* that is, ' "guilty knowledge and intent" of the organization's criminal purposes' (*People v. Castenada*, *supra*, 23 Cal.4th at p. 749, quoting *Scales v. United States*, *supra,* 367 U.S. at p. 228), and does not require a defendant's subjective knowledge of particular crimes committed by gang members," as urged by Thomas. (See *Carr*, *supra*, 190 Cal.App.4th at p. 488, fn. 13.)

Here, there is evidence in the record showing that at least as early as June 2010, about 10 *months* before the shooting, Thomas was in fact an active member of ESV. Indeed, Deputy Fernando Munoz testified he contacted Thomas in Apple Valley, California in June 2010. At that time, Deputy Munoz completed a "gang card" on Thomas. During the contact, Thomas admitted to being a member of ESV. Deputy Munoz at the time noticed many of Thomas's tattoos were indicative of membership in ESV, including the letters "I" tattooed on Thomas's right forearm and "E" on his left forearm; the words "Inland Empire" on his throat; and the collage of tattoos on his chest that included the word "Victoria."

In addition, the record shows that during Deputy Gaytan's testimony regarding ESV and the various crimes committed by many of its members proffered to show a pattern of criminal gang activity (but not knowledge), Deputy Gaytan testified Thomas was convicted in December 2007 for the offense of assault with a deadly weapon in violation of section 245, subdivision (a)(1). Thus, Thomas committed one of the *many* predicate crimes relied on by Deputy Gaytan to show ESV engaged in a "pattern of criminal activity" for purposes of subdivisions (a) and (e) of section 186.22.

We conclude there is sufficient evidence in the record, including the inferences to be drawn from such evidence, supporting the finding Thomas possessed the requisite "knowledge" for purposes of subdivision (a) of section 186.22 that ESV engaged in a pattern of criminal gang activity. (See *Carr*, *supra*, 190 Cal.App.4th at p. 488, fn. 13.) Our conclusion is also based on the fact that Thomas committed the offenses against Pena ostensibly because Pena refused to take "care of" his girlfriend, after members of ESV deemed her a "snitch"; and that Thomas committed these crimes with Michael, who was then in charge of ESV, and with Jenna, who also was a member of ESV.

E. Sentencing Contentions

1. *Staying Sentence on Count 6*

Thomas and Michael contend their punishment in count 6 for the substantive gang offense (§ 186.22, subd. (a)) should be stayed pursuant to subdivision (a) of section 654.[6] The People agree, as do we. (See *People. v. Mesa* (2012) 54 Cal.4th 191, 195-198

---

[6]     Sentence on Count 6 was stayed in Jenna's case.

29

[noting when the same act that constitutes active participation in a gang also constitutes the felony or felonies on which the substance gang offense is based, a court may not impose sentence on both].)

2. *One-Year Enhancement Imposed Under Section 667.5*

Thomas next contends the court used the same prior conviction to impose erroneously a one-year prison prior enhancement under section 667.5, subdivision (b) and a five-year enhancement under section 667, subdivision (a). However, the People note and the record shows the prosecution alleged *two* prior convictions for assault under the prison prior allegations, one from San Bernardino County in 2007 (noted *ante*), and another from Los Angeles County in 2009. The record further shows that the prosecutor proved both of these prison priors beyond a reasonable doubt and that the People only alleged Thomas suffered the 2009 assault in connection with the five-year enhancement under section 667, subdivision (a). As such, we reject this contention.

3. *Presentence Credits Under Section 2933.1*

Thomas and Michael contend the court erred when it denied each presentence conduct credits under section 2933.1.[7] The People agree and note only defendants convicted of murder are denied such credits. (See § 2933.2, subd. (a).) Because Thomas and Michael were convicted of *attempted* murder, section 2933.2, subdivision (a) does not apply, and, thus, we conclude the court erred when it denied them conduct credits under section 2933.1.

---

[7]     Jenna received conduct credits under section 2933.1.

4. *Sufficiency of the Evidence and Michael's Prior Assault Conviction*

Michael contends remand is necessary on the issue of whether his first strike and serious felony prior qualified as a strike and serious felony under sections 667.5, subdivision (c) and 1192.7, subdivision (c). The People agree. While assault with a deadly weapon is a serious felony (§ 1192.7, subd. (c)(31)), "assault merely by means likely to produce [great bodily injury], without the additional element of personal infliction, is not included in the list of serious felonies." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1065, italics omitted.)

Here, the record of conviction presented by the People does not show whether Michael committed his prior assault conviction under former section 245, subdivision (a)(1) with a deadly weapon or by means of force likely to produce great bodily injury. As such, we conclude the matter must be remanded for retrial on this limited issue.[8]

## DISPOSITION

Thomas's case is remanded for the limited purpose of determining his presentence conduct credits under section 2933.1. Michael's case is remanded for the limited purpose of determining both his presentence conduct credits under this same statute *and* whether his prior conviction under former section 245, subdivision (a)(1) was a prior violent or serious felony within the meaning of sections 667.5, subdivision (c) and 1192.7, subdivision (c).

---

[8]    Because we have either rejected on the merits defendants' "claims of error or have found any assumed errors to be nonprejudicial," we must also reject any claim of prejudicial cumulative effect. (See *People v. Sapp* (2003) 31 Cal.4th 240, 316.)

The trial court is directed to stay under section 654, subdivision (a) the sentences imposed on Thomas and Michael on the substantive gang offense (§ 186.22, subd. (a); count 6). The trial court is further directed, after the hearings on remand, to prepare if necessary new abstracts of judgment for both Thomas and Michael and forward certified copies of each to the Department of Corrections and Rehabilitation. In all other respects, the judgments of conviction are affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.

32